820 So.2d 1196 (2002)
Hester WOMACK
v.
CUSTOM HOMES AND RENOVATIONS, Tyrone Wilson, Asset Management Services, C.R. Trahan Maintenance, Co., CR Trahan, XYZ Insurance Company, VWX Insurance Company, and QRS Insurance Company, et al.
Ceasar Trahan, d/b/a C.R. Trahan Maintenance Company,
v.
Hester Womack.
Nos. 2002-CA-0193, 2002-CA-0194.
Court of Appeal of Louisiana, Fourth Circuit.
June 5, 2002.
*1198 Sidney L. Shushan, Charlotte L. Gilman, Guste, Barnett & Shushan, New Orleans, LA, for Plaintiff/Appellee.
Wayne E. Garrett, New Orleans, LA, for Defendant/Appellant.
(Court composed of Chief Judge WILLIAM H. BYRNES III, Judge CHARLES R. JONES, Judge JAMES F. McKAY III).
WILLIAM H. BYRNES III, Chief Judge.
The defendant-appellant, C.R. Trahan, d/b/a Trahan Maintenance Company (hereinafter referred to collectively as "Trahan"), appeals a default judgment rendered on January 25, 2001, against Trahan in the sum of $35,762.93 in favor of the plaintiff, Hester Womack. That judgment also condemned "C.R. Trahan maintenance Company, C.R.Trahan individually, VWX Insurance Company, Custom Homes & Renovations, Tyrone Wilson individually and XYZ Insurance Company for the sum of TWO HUNDRED SEVENTY-FIVE THOUSAND DOLLARS AND 00/100 ($275,000.00) ..."
Plaintiff's home was damaged by fire. Trahan agreed to do repair work to the plaintiff's home in accordance with a proposal he submitted dated July 27, 1997 for $139,000.00. When Trahan failed to complete the work to plaintiff's satisfaction, she retained Tyrone Wilson, d/b/a Custom Home Renovations to do the work instead based on a contract dated November 24, 1997. Mr. Wilson did not perform to her satisfaction either, whereupon plaintiff entered into a contract with Asset Management Services dated January 8, 1999, for the purpose of completing "the project which [Wilson and his company] had failed to complete." Plaintiff's petition alleges that Asset Management also failed to complete the work, whereupon plaintiff sued Trahan, Wilson, their companies, Asset Management Services and their unknown insurers.
In her petition plaintiff alleged that Trahan, "failed to complete the work contracted for, and either used defective materials *1199 for some of this work, or work done in an improper manner, or both, in violation of the contract, plans, and specifications." This is consistent with plaintiff's court testimony as will be discussed in greater detail hereinafter whereby her complaints were largely limited to Trahan's failure to finish what he contracted to do.
Moreover, plaintiff's petition contains no allegation of fraud or bad faith against Trahan. Nor does it contain any allegations employing other equivalent terminology which could be construed as such.
Her petition contained allegations against Tyrone Wilson and Custom Homes and Renovations which were more serious and detailed than those directed against Trahan:
A. Defendants Failed to properly replace and repair the roof of Plaintiff's house.
B. Defendants failed to properly secure the structural supports of the house which led to significant damage to Plaintiff's house. [Emphasis added.]
C. Defendants failed to secure the necessary permits and licenses in order to complete the downstairs portion of Plaintiff's house.
D. All other acts or omission which constitute a breach of contract.
As will be seen hereinafter, the above allegation against Wilson and his company regarding the structural supports, which is consistent with plaintiff's court testimony, is the most serious element of damage alleged and proved.
There is a hand written note signed by the trial judge dated 5-10-01 on the face of Trahan's motion for new trial stating: "Denied. Personal service was made." Trahan interprets this as a denial for untimeliness. Trahan was personally served with notice of this judgment on Tuesday, April 17, 2001. Plaintiff filed a motion for a new trial on Thursday, April 26, 2001, which was timely pursuant to LSA-C.C.P. art.1974. Goodman v. Roberts, 549 So.2d 897 (La.App. 3 Cir.1989). Therefore, if the trial court dismissal of Trahan's motion for new trial was for untimeliness, then it was clear error to do so.
However, the handwritten notation does not say that the motion for new trial was denied as untimely. It is the opinion of this Court that had it been the intention of the trial court to give untimeliness as the reason for denying Trahan's motion for new trial it would not have done so in a more direct manner than by making an oblique reference to the manner of service. This Court finds that the trial court's denial of the motion for new trial was based on the lack of merit in Trahan's motion. The memorandum annexed to Trahan's motion is only one paragraph long and includes only the following very general assignment of errors:
The defendants did fully complete the work contracted for, the defendants did not use defective materials for the work performed and did not do work in an improper manner. The defendants, C.R. Trahan and C.R. Trahan Maintenance Co. did not violate the subject contract, plans and specifications. Therefore, the judgment ... appears clearly contrary to the law and the evidence.
It is no wonder that the trial court found no merit in Trahan's conclusory statement that the judgment was contrary to the law and the evidence when it was unsupported by any references to either the law or the evidence in the record.
Trahan then filed a suspensive appeal which was converted to a devolutive appeal when he failed to pay the costs required for a suspensive appeal. Trahan filed *1200 further motions and a Petition for Nullity which were opposed by plaintiff and denied by the trial court.
The real issue on this appeal, which is dispositive of all others, is whether plaintiff properly established a prima facie case as required by LSA-C.C.P. art. 1702(B) for the damages that the trial court judgment condemned Trahan to pay her. See Spear v. Tran, 96-1490, p. 6-7 (La.App. 4 Cir. 9/18/96), 682 So.2d 267, 271.
Trahan agreed to do the following work:
1. Completely gut out all damaged plaster, studs, trim, flooring, fixtures both electrical and plumbing, doors, and windows.
2. Completely frame structure according to specifications and agreement between myself and customer.
3. Rough in new plumbing drains and water supply in accordance to code.
4. Rewire structure installing all new boxes, outlets and switches.
5. Run duct work [ductwork] and install new central air and heating.
6. Install new drywall throughout, tape and finish.
7. Install all cabinets, bases, vanities, moulding [sic], counter-tops, doors and casings and trim.
8. Install new appliances in kitchens, and laundry rooms.
9. Paint interior and exterior color chosen by owner, exterior painting includes sanding, scraping, washing, priming, caulking and 2 layers topcoat.
10. Replace and repair all flooring including hardwood finishing, and ceramic flooring in baths.
At the outset, we must express some skepticism about the lower court judgment against Trahan for an amount in excess of $300,000.00 when his contract with plaintiff was for only $139,000.00.
At the hearing to confirm the default, the plaintiff, Ms. Womack, identified photos depicting a number of problems with the house, but she never says that the work done by Mr. Trahan caused those problems with the rather insignificant exception of what was shown in picture No. 1:
Q. Miss Womack, what does Photograph No. 1 show?
A. It shows as you're walking in the entry of the hallway, Mr. Trahan put this board here with holes up in it.
Q. For clarification, is that a photograph of your front steps leading into your front door?
A. Yes. That's the entry door leading into the apartment.
Q. And Photograph No. 5, would you identify what that photograph shows?
A. This is a beam that is coming away from the house inside.
THE COURT:
What photograph is this?
MS. GILMAN:
No. 5. I apologize. I'm going out of order.
BY MS. GILMAN:
Q. I call your attention to Photograph 12 and through 16, Miss Womack. What do these photographs show?
A. This shows the outside of the house. This is the outside of the house where all of the structure is falling down.
Q. And Photograph No. 18?
A. This shows where the wall is cracking. A new wall of the house is like falling, leaning, and it's a new crack.
The record does not allow this Court or any reasonable fact finder to infer that the defects shown in the pictures (with the exception of No. 1) are attributable to Mr. *1201 Trahan. For example, not only are the photos not even implicitly identified as depicting problems ascribable to Mr. Trahan, but Ms. Womack went so far as to describe some of the most significant damage depicted in the photos as arising out of work performed by Mr. Wilson:
THE COURT:
That's all right.
In Picture No. 5 is the part of the upstairs?
THE WITNESS [MS. WOMACK]:
Yes, Your Honor.
THE COURT:
Where you said this was the wall that' coming
THE WITNESS:
Completely a loose from the floor.
THE COURT:
And this was done by Tyrone Wilson?
THE WITNESS:
Yes, Your Honor
[Emphasis added.]
Immediately following this testimony, but still in the context of work having been done by Mr. Wilson, Ms. Womack describes what is depicted in Photograph No. 3 as "nails sticking out of the wall, as though through the whole house. Those are nailheads coming through the plaster." Photograph No. 4 is then described by Ms. Womack in the same context as "the bedroom where the wall is coming a loose from the wall and the floor also." The only reasonable inference to be drawn from this statement in the context of her testimony as a whole is that those defects depicted in photos No. 3 and No. 4 must be attributed to Mr. Wilson and not Mr. Trahan.
When Ms. Womack uses the pronoun "he" to ascribe blame for the "big black pipe sitting on the outside of my house" shown in Photograph No. 9, it is clear from the record that she is referring to Mr. Wilson and not Mr. Trahan.
Ms. Womack then identified Photograph No. 10 as piping improperly installed by Mr. Wilson, not Mr. Trahan. She identified Photograph No. 11 as indicative of the ill-advised decision on the part of Mr. Wilson (not Mr. Trahan) to replace 12-inch beams with 10-inch beams, resulting in the house not being level or structurally sound.
The plaintiff called Tommy Boyd, a licensed contractor, to give testimony in support of her damage claim:
Q. Did you give Miss Womack a proposal to bring her house up to living standards?
A. Yes.
Q. What is the amount of that proposal?
A. I estimated $275,000.
Q. Is that an exact figure?
A. No. It's, from what we have, as far as to get it right, it's a lot of unforeseen to do when you begin to redo it. So, an estimate of approximate value.
He went on to testify that Mr. Trahan had gutted the house as called for "except for the roof and the front that was supposed to have been painted over wasn't properly done. [sic]." There was burned wood in the roof that he said was "just kilzed over with burn paint" instead of being removed.
Mr. Boyd testified that the house was improperly raised and shored up and that it had resulted in the floor warping. He said that to have the house properly shored would cost between $30,000.00 and $40,000.00 dollars and that it would cost between $10,000.00 and $15,000.00 to remove and replace the damaged wood in the *1202 attic. He said that the interior walls of the upstairs needed to be redone by having the stress cracks cut out and rerocked and floated, taped, textured, and painted which he estimated would cost between $25,000.00 and $30,000.00. He said that to fix the floors, including the basement floor, would cost $20,000.00.
Mr. Boyd felt that the work that had been done before he was called in showed signs of inexperience because it was being done from the top down when it should have been done from the bottom up because you have to make sure the work on top rests on a good foundation below. He also felt that most of the problems with the windows would be rectified by straightening up the house which is out of plumb, although they may have to be renailed. The doors and door frames needed to be re-plumbed. The kitchen cabinets and countertops were separating from the walls because the house was out of plumb. When asked what it would cost to replace the kitchen cabinets and countertops he testified that he wouldn't have to replace them. Instead he would take them down and put them up again. Finally, Mr. Boyd identified his written estimate of what it would take to repair the plaintiff's house which went into greater detail.
From the foregoing it is apparent that the greatest single factor in the damages sought by plaintiff is the unlevel condition of the house. However, the evidence on the face of the record indicates that Mr. Trahan did not contract to do the work that could have caused the unlevel condition, that he in fact did not do that work and is not responsible for the defects attributable to it. That work appears to have been done by another defendant, Tyrone Wilson, d/b/a Custom Homes & Renovations. The plaintiff described the floors in her home:
They crack and they wave. You go up and down, up and down throughout the whole house.
Plaintiff's brief attributes problems with the unlevel condition of the house to Mr. Trahan based on Mr. Boyd's testimony. But Mr. Boyd merely testified as to the nature of the problem. He did not testify as to who caused the problem which is understandable because he did not enter the picture until after the allegedly defective work was done. In other words, he was not present when the work Ms. Womack complains of was done and his opinion, had he given it (which he did not), as to who did the work would almost certainly have to be based on hearsay. Plaintiff's testimony attributed the unlevel condition in the house to the fact that Mr. Wilson replaced twelve-inch beams with ten-inch beams which resulted in structural unsoundness. She gave no testimony which would support a prima facie case against Mr. Trahan for problems attributable to unlevel conditions in the house. Her testimony was consistent with that of Mr. Boyd who also attributed the problems to the replacement of two by twelves with two by tens, although he did not suggest who might be responsible for doing this. This evidence is not sufficient to establish a prima facie case against Trahan on this very significant issue.
Plaintiff testified that Mr. Wilson put her central air and heat units in the patio instead of in the back yard where he was supposed to put them. We assume that this corresponds to the item in Mr. Boyd's $275,000.00 estimate for work to be done outside described as, "place A/C units raised platform." We cannot tell from the face of the record to what extent Mr. Trahan should be held responsible for Mr. Wilson's improper placement of the "A/C units," if at all. Even in a default the burden is on the plaintiff to prove her case, *1203 and in this case the plaintiff failed to establish a prima facie case regarding the "A/C units."
The plaintiff complained about the wiring job done by Mr. Wilson. Its defects should not be attributed to Mr. Trahan. She complained about "a big black pipe sitting on the outside of my house." But that pipe was installed by Mr. Wilson, not Mr. Trahan. We cannot tell from the face of the record what the extent of Mr. Trahan's responsibility for that pipe should be, if any.
The only reasonable inference to be drawn from the testimony of the plaintiff and Mr. Boyd concerning the job that Trahan did in gutting the house is that it was satisfactorily completed with only minor exceptions. This was the first of the ten items on Trahan's proposal and is probably the most significant. Ordinarily Trahan would be entitled for partial performance credit for this work. We are unable to tell from the record why this was not done.
Plaintiff seeks to overcome the problem of whether Trahan should be held responsible for the subsequent shortcomings of Wilson by arguing that Trahan's failure to perform was in bad faith which makes him "liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." LSA-C.C. art.1997. First of all we note that plaintiff was able to cite no case which goes anywhere remotely as far as to hold something that would suggest that the snafus in Wilson's work could be considered to be "a direct consequence of [Trahan's] failure to perform" in contemplation of LSA-C.C. art.1997. Secondly, and more significantly, plaintiff failed to make any allegations of bad faith in her petition and therefore is not entitled to recover bad faith consequential damages in a default proceeding. Simon v. Fasig-Tipton Co., 92-173, p. 34 (La.App. 3 Cir. 3/22/95), 652 So.2d 1351,1374; Wright Bros. Corp. v. Colomb, 517 So.2d 1194, 1197 (La.App. 4 Cir.1987). A default judgment is not permitted to make an award or grant relief different in kind from that demanded in the petition and can only include damages proven to be due as a remedy. Spear v. Tran, 96-1490, p. 6 (La.App. 4 Cir. 9/18/96), 682 So.2d 267, 271. The plaintiff is limited to those matters of which the defendant has been properly notified through service of process. Id. Plaintiff's petition in no way put Trahan on notice of the potential for exposure to consequential bad faith damages and plaintiff's petition may not be enlarged to conform to the evidence in a default proceeding. Id.
Additionally, the face of the record shows that there are items shown on the Boyd estimate making up the $275,000.00 figure which were never part of the Trahan proposal, such as, "carport in rear yard 4 rotton [sic] post to be changed out."
Moreover, this Court cannot be reasonably certain whether a number of items included in the Boyd estimate for $275,000.00 have anything to do with the work Mr. Trahan agreed to do because of differences in terminology employed by Mr. Boyd and Mr. Trahan. In other words, plaintiff has failed to establish a prima facie case as to those items. For example, item "10" in the Trahan agreement calls for him to, "Replace and repair all flooring including hardwood finishing, ceramic flooring in baths." This Court is unable to ascertain from the record whether this item "10" in the Trahan contract was intended to obligate Mr. Trahan to do the following two basement items included in Boyd estimate:
install carpet in bedrooms, hall, and living room
vinyl floor in kitchen
*1204 The testimony and other evidence in the record fails to elucidate this issue.
The foregoing observations alone are sufficient to establish that the plaintiff failed to make a prima facie case in support of the judgment rendered against Mr. Trahan. It is, therefore, unnecessary to address plaintiff's other assignments of error. Accordingly, the default judgment rendered against Mr. Trahan and C.R. Maintenance Company is vacated and the case is remanded for further proceedings consistent with this opinion. The judgment of November 13, 2001, dismissing Trahan's nullity petition and related motions is moot.
DEFAULT JUDGMENT VACATED AND REMANDED; JUDGMENT OF NOVEMBER 13, 2001 IS MOOT.