MICHAEL E. KIRBY, Judge.
 

 1 plaintiff, Hester Womack, appeals the March 14, 2008 trial court judgment in favor of defendants, C.R. Trahan, C.R. Trahan Maintenance Company, Tyrone Wilson, Custom Homes and Renovations, Andrew Mercadel and Asset Management Services, dismissing plaintiff’s suit against defendants.
 

 In
 
 Womack v. Custom Homes and Renovations,
 
 02-0193, 02-0194, pp. 1-2 (La.App. 4 Cir. 6/5/02), 820 So.2d 1196, 1198,
 
 *1061
 
 this Court gave the following statement of this case:
 

 Plaintiffs home was damaged by fire. Trahan agreed to do repair work to the plaintiffs home in accordance with a proposal he submitted dated July 27, 1997 for $139,000.00. When Trahan failed to complete the work to plaintiffs satisfaction, she retained Tyrone Wilson, d/b/a Custom Home Renovations to do the work instead based on a contract dated November 24, 1997. Mr. Wilson did not perform to her satisfaction either, whereupon plaintiff entered into a contract with Asset Management Services dated January 8, 1999, for the purpose of completing “the project which [Wilson and his company] had failed to complete.” Plaintiffs petition alleges that Asset Management also failed to complete the work, whereupon plaintiff sued Trahan, Wilson, their companies, Asset Management Services and their unknown insurers.
 

 |2The 2002 opinion vacated a default judgment rendered against Mr. Trahan and C.R. Trahan Maintenance Company, and remanded this case for further proceedings. Following trial in 2008, the trial court found no liability on the part of defendants, and ruled in their favor, dismissing plaintiffs claim for damages.
 

 On appeal, plaintiff argues that the record establishes that the work of Mr. Tra-han and Mr. Wilson caused severe damage to the foundation of plaintiffs house, which started a chain of events culminating in the loss of her house through foreclosure. Plaintiff also argues that the evidence in the record is legally insufficient to support the conclusion reached by the trial court. Specifically, plaintiff argues that she carried her burden of proving that the defendants’ work was a proximate cause of the foundation problems, that defendants did not carry their burden of proving an intervening cause, i.e. the work of Melvin Peterson, and that Mr. Wilson’s non-performance was gross fault under La. Civil Code article 2004. Plaintiff further argues that she should be awarded damages from all of the defendants.
 

 The plaintiff seeking damages in a civil action must prove each element of his or her claim by a preponderance of the evidence.
 
 Erwin v. State Farm Mutual Automobile Insurance Company,
 
 34,127, p. 4 (La.App. 2 Cir. 11/1/00), 771 So.2d 229, 232. In
 
 Mistich v. Volkswagen of Germany, Inc.,
 
 95-0939, pp. 4-5, (La.1/29/96), 666 So.2d 1073, 1077, our Supreme Court stated as follows:
 

 It is a well settled principle that an appellate court may not set aside a trial court’s finding of fact unless it is clearly wrong. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
 
 Rosell v. ESCO,
 
 549 So.2d 840 (La.1989);
 
 Arceneaux v. Domingue,
 
 365 So.2d 1330 (La.1978). Where two | ..permissible views of the evidence exist, the factfinder’s choice between them cannot be manifestly wrong.
 
 Rosell, supra
 
 at 845;
 
 Watson v. State Farm Fire & Casualty Ins. Co.,
 
 469 So.2d 967 (La.1985);
 
 Arceneaux, supra
 
 at 1333. Where the factfinder’s conclusions are based on determinations regarding credibility of the witnesses, the manifest error standard demands great deference to the trier of fact, because only the trier of fact can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said.
 
 Rosell, supra
 
 at 844. The reviewing court must always keep in mind that if a trier of fact’s findings are reasonable in
 
 *1062
 
 light of the record reviewed in its entirety, the court of appeal may not reverse even if convinced that if it had been sitting as trier of fact, it would have weighed the evidence differently.
 
 Stobart v. State, Through DOTD,
 
 617 So.2d 880 (La.1993);
 
 Housley v. Cerise,
 
 579 So.2d 978 (La.1991);
 
 Sistler v. Liberty Mutual Ins. Co.,
 
 558 So.2d 1106 (La.1990).
 

 The following testimony was offered at trial. Thomas Boyd, Jr., a licensed contractor and owner of Quality Carpentry, was accepted as an expert in residential construction. In 2001, he gave plaintiff an estimate to redo work that allegedly had been improperly performed on her property located at 8206 Louisiana Avenue Parkway. He stated that he went to the job site and reviewed the work that needed to be redone. He explained in detail the items listed in his estimate. The list was very lengthy and included Mr. Boyd’s estimate of the total cost of the job, which was $275,000.00. He testified that approximately $30,000.00 of that amount represented the costs of shoring the house. Mr. Boyd stated that at the time of trial, his estimate for the costs of the repair work on plaintiffs home would be approximately double his 2001 estimate. He said that whoever did the prior shoring work on the house started all of the other problems.
 

 Mr. Boyd testified on cross-examination that the contractor’s license he holds does not allow him to perform a $275,000.00 contract. He said his license limits him to a $75,000.00 contract, but his limit was $275,000.00 at the time of his |42001 estimate. He said a homeowner would need to get a permit to allow him to perform a job in excess of $75,000.00. He stated that he gave plaintiff an estimate, but he was not given the job. Mr. Boyd testified that he did not notice if plaintiffs property had a subsidence problem. He could not name any of the three previous contractors that worked on plaintiffs house, and did not know the specific work for which each contractor was responsible.
 

 The plaintiff was the next witness. She testified that she acquired the property at 3206 Louisiana Avenue Parkway in the community property settlement with her ex-husband, but she no longer owned the property at the time of trial. Plaintiff stated that the property was damaged by fire after the community property settlement. She said the fire did not burn the house to the ground, but it caused major damage to the roof and floors. She said that before the fire, she did not have problems with windows and doors not closing or with cracks in the wall or with cabinets and counters pulling away from the wall. The house did not lean front to rear or side to side before the fire.
 

 After the fire, plaintiff hired contractors to repair and rebuild the house. The first contractor she hired was Cesar Trahan. She entered into a contract with him on July 27,1997. She said Mr. Trahan gutted the house, framed the apartment upstairs, and did repairs. She said Mr. Trahan did not finish all of the work he was hired to do, and she let him go. She also said the work performed by Mr. Trahan was very bad. Her second contractor was Tyrone Wilson. She entered into a contract with him on November 24, 1997. She said he completed the work on the two upstairs’ apartments but did none of the work downstairs that she hired him to do. She said Mr. Wilson left the job after being paid for the upstairs’ work. She said she tried to call Mr. Wilson regarding alleged defects in his work, but she |ñnever sent him written requests because she did not know his address. Plaintiff testified that Mr. Wilson did not do any shoring work on her house. The third contractor she worked with was Mr. Mercadel’s company,
 
 *1063
 
 Asset Management. Plaintiff entered into a contract with Mr. Mercadel on January 8, 1999. She said he framed the house “because the house was falling,” and put cement down in the basement. He told her that faulty shoring work had been performed on her house. She said Mr. Mercadel left the job without finishing the work she hired him to do, and she did not pay him the total amount of money called for in the contract. She said he initially promised to come back and straighten out what she considered his “shoddy” work, but he did not do so and eventually stopped answering her calls.
 

 Plaintiff testified that after all three contractors finished their work, there were still cracks in the walls, and there were problems with the cabinets, doors and windows. She said Melvin Peterson was a contractor who fixed the metal walkway steps to the back of the house, but he did not do any jack hammering. Plaintiff stated that she did not sue Mr. Peterson because he was going to perform shoring work on the house, but an inspector stopped the work because of the absence of a permit for the work. She said Mr. Peterson put cement flooring in her basement prior to the fire. He also put brick flooring on one side of the downstairs basement.
 

 Plaintiff asked Mr. Trahan to raise “the downstairs to the upstairs,” and he did that. She said Mr. Wilson did not do any work downstairs. She said Mr. Mercadel “cased the house up” to stop it from leaning so much, and he placed cement on the floor. She said Mr. Boyd came out and looked at her house after all three contractors were finished.
 

 | fiPlaintiff contracted with Mr. Wilson to do the job for $80,000.00. She paid him, but Mr. Wilson gave her back $15,000.00 of the money she had paid him for the downstairs portion of the job that he did not do. Plaintiff admitted that by refunding the $15,000.00, Mr. Wilson put her on notice that he could not repair the basement portion of the house. She said she noticed problems with cracks in the wall and problems with closing doors and windows in March 1999 when she moved into the house. Plaintiff identified photographs of her house that were introduced into evidence.
 

 Cesar Trahan, the owner of C.R. Trahan Maintenance Co., testified that he briefly worked on plaintiffs house in 1997. He said he worked on the upstairs portion of the house, and did no shoring or foundation work. He testified that the only work he did downstairs was bracing the center of the house with a partition wall to support the work he was doing upstairs, which was dividing the house into separate living units. He said he did this work without making any changes to the foundation. Mr. Trahan testified that after working a couple of months on this job, he was locked out of the house. He returned shortly afterward to reclaim his tools, but he did not return to the property again after that time. He could not say whether the house started leaning and shifting after he worked on it.
 

 Tyrone Wilson testified that in 1997 and 1998, he was the sole proprietor of a business called Custom Homes and Renovations. During that time, he performed work on plaintiffs property. He was hired by plaintiff to perform work upstairs and downstairs, but refused to perform the downstairs work because plaintiff wanted to divide the house into separate units and had not complied with zoning requirements for that type of work. Mr. Wilson refunded money paid to him by plaintiff for the downstairs work. He testified that he completed the upstairs work 17he was hired to do. He said there were support beams in the middle of the house when he started
 
 *1064
 
 the job. He testified that he did not do any shoring work on the house, and was not aware of any problems with the house leaning. He testified that the house was in good condition when he finished his work. Mr. Wilson met with a real estate inspector at the house on February 4, 1998. The inspector found that the workmanship was good on the repairs that had been completed.
 

 Plaintiff was called back to the stand after the testimony of Mr. Wilson. She testified that Mr. Peterson did not do any work in her basement after Mr. Trahan and Mr. Wilson worked on the house. After being presented with her earlier deposition, plaintiff then testified that Mr. Peterson did do some work after Mr. Trahan and Mr. Wilson completed their work, but before Mr. Mercadel did his work on the house. She said Mr. Peterson was trying to put some beams at the bottom of the house, and a city inspector showed up and stopped the work. At trial, she said Mr. Peterson was “going to try” to break up the downstairs floor but did not actually do anything to the concrete in the basement before the inspector arrived. She said the work Mr. Peterson did for her did not affect any bricks or concrete in the basement. However, at her deposition, the following exchange occurred:
 

 Q. And at the time Mr. Wilson completed his work you had no tenant downstairs, isn’t that correct?
 

 A. No.
 

 Q. Who did you have break up [sic] the concrete and brick in the downstairs? A. His name was Mr. Melvin Peters.
 
 [1]
 

 IsAlso in her deposition, the following exchange occurred regarding money paid by plaintiff to Mr. Peterson:
 

 Q. This is the person who broke up the downstairs?
 

 A. Partially, yes.
 

 The proposal that Mr. Mercadel drafted for work to be performed on plaintiffs house stated, “The recently completed shoring of the above house in question is nowhere near level.” Plaintiff insisted that no one did any work on the downstairs besides Mr. Trahan and Mr. Merca-del. She claimed that Mr. Peterson only did work on the gate and stairs leading to the house.
 

 Mr. Mercadel did not testify at trial, but his deposition was introduced into evidence. He testified that he is the sole proprietor of Asset Management. The work he contracted to do for plaintiff included an item listed as “pour slab to grade downstairs.” He explained that when he first saw the house, the basement had a dirt floor with busted out concrete still in place that had been jack hammered. He said that the concrete floor had been jack hammered and parts of slabs of concrete remained, causing the middle of the house to sink. He said that some of the repairs that had already been made to the house since the fire including framing, but he had to do double framing because the house had sunk in the middle. He said his company shored the middle of the house and replaced the concrete floor of the basement. He described the other work he performed on plaintiffs house until she was unable to pay him anymore. Mr. Mercadel stated that he did not know what work Mr. Trahan or Mr. Wilson performed on the house before his job started. His company worked on this job for six to eight months in 1999, and he has not seen the house since that time.
 

 
 *1065
 
 |9The trial court issued written reasons for judgment in support of her finding of no liability on the part of the defendants. After summarizing the testimony at trial, the trial court found that no credible witness testified that any of the defendants performed any faulty or sub-par work. The court found that the only evidence offered in this regard consisted of plaintiffs conclusory statements that the work was shoddy and incomplete. The court also found that plaintiff offered no evidence to support her claim that the defendants were in bad faith in not performing the work under the contracts and in not noticing problems with the house’s structure. As for Melvin Peterson, who was hired to perform work on the house after Mr. Trahan and Mr. Wilson, the trial court noted that although plaintiff insisted that Mr. Peterson, who is not a licensed contractor, did not do any jack hammering in the house, she stated at her deposition that she hired him to break up the concrete in the basement. The court further noted that plaintiffs witness, licensed contractor Thomas Boyd, Jr., testified that while jack hammering would not cause all of the problems with the house, it would certainly make them worse. In summary, the trial court found that the defendants are not liable to plaintiff because the weight of the credible evidence in this case indicates that none of the defendants’ work was responsible for the problems created in plaintiffs home post-fire, and that defendants performed their duties under their contracts in good faith.
 

 After reviewing the record in its entirety, we conclude that the trial court was not manifestly erroneous or clearly wrong in finding no liability on the part of the defendants. The trial court’s finding that the credible evidence in this case indicates that defendants are not responsible for the problems with plaintiffs house was based on the court’s credibility determinations, which we find to be | ^reasonable. It is obvious from the reasons for judgment that the trial court did not find plaintiff to be a credible witness. With regard to the work of Melvin Peterson, who is not a licensed contractor, plaintiffs trial testimony was in conflict with her earlier deposition testimony. Although plaintiff testified at trial that Mr. Peterson did not do anything to the bricks or cement in her basement, she stated in her deposition testimony that Mr. Peterson broke up the cement and bricks in the downstairs portion of the house. She admitted that Mr. Peterson worked on her house after Mr. Wilson and before Asset Management. Although Mr. Boyd said that whoever did the prior shoring work on the house started all of the other problems, he could not name any of the people who had previously worked on plaintiffs house, and did not know the specific work for which each person was responsible. Other than plaintiffs self-serving testimony, none of the evidence presented at trial established that any of the actions or inactions of the defendants caused the problems with the plaintiffs house.
 

 For the reasons stated above, we affirm the trial court judgment.
 

 AFFIRMED.
 

 [1]
 

 . At her deposition, plaintiff sometimes referred to Melvin Peterson as Melvin Peters, but she stated that this was the same person.